UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 21-205 (DLF) |
| v. | ) | |
| PATRICIA TODISCO | ) | |

# MEMORANDUM IN AID OF SENTENCING

On the morning of January 6th, Patricia Todisco and her friend drove from New York City to Washington, D.C.. She was one of thousands of people who came to the Capitol that day, one who believed a falsehood advertised to millions – that former Vice President Mike Pence had the power to overturn the fraudulent election. As a result, she traveled to Washington, D.C., to "Stop the Steal."

Ms. Todisco walked from the rally to the Capitol as Trump encouraged his supporters to do. Inside the Capitol, she walked throughout the building, spending 28 minutes inside. After the incident, she did not post messages on social media about the event. She was arrested a few weeks later and spoke with law enforcement. She had no plan, intention, or thought to take over the government on January 6th. She was not part of a militia group seeking to overthrow the government. She cooperated with law enforcement thereafter, and has demonstrated remorse. For these reasons, no further incarceration should be imposed. Based on the nature and circumstances of the offense, her background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of time served or probation, either of which would be a sentence not greater than necessary to address her conduct in this case.

## TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known. Approximately 30,000 people were expected to attend.[1] Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[2] The vitriol and antagonistic speech spread over the crowd of thousands. Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

| | |
|---|---|
| **11 a.m.** | High-profile figures of the Republican Party spoke directing the Trump supporters:<br>• Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[3]<br>• Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[4]<br>• Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican |

---

[1] Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants. *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[2] George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[3] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

[4] *Id*. (emphasis added).

- lawmakers to challenge the election result and **"punch back from Donald Trump."**[5]
- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right.**"[6]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[7]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[8]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[9] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania |

---

[5]   *Id*. (emphasis added).

[6]   *Id*. (emphasis added).

[7]   *Id*. (emphasis added).

[8]   *Id*. (emphasis added).

[9]   *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

> Avenue. **And we're going to the Capitol**, and we're going to try and give.[10]

By this time, his supporters started heading towards the Capitol and started fighting with the police.

| | |
|---|---|
| **1:10 p.m.** | Supporters "begin grappling with police on the Capitol steps."[11] |
| **1:30 p.m.** | After Trump's speech, "supporters being marching toward the U.S. Capitol."[12] |
| **2:11 p.m.** | Photographs indicate that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[13] |
| **3:06 p.m.** | Ms. Todisco enters the Senate Wing Doors of the Capitol, nearly an hour after hundreds of people had entered the Capitol through the same doors. |

Ms. Todisco left the building approximately 28 minutes later. On January 22, 2021, she was arrested and agreed to speak to law enforcement without an attorney.

---

[10]  *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[11]  Petras, *Timeline*, footnote 2 supra.
[12]  Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).
[13]  Petras, *Timeline*, footnote 2 supra.

## LEGAL PRINCIPLES

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G),[14] is a class B misdemeanor or "petty offense", as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less. The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment. 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow. *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id.* at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with

---

[14] On April 27, 2022, Ms. Todisco pled guilty to Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), according to the language of the Plea Agreement and the Statement of Offense. The Plea Agreement lists the charge as Count 5 of the Indictment, which is the Disorderly Conduct charge.

6

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2 (B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

## ARGUMENT

Ms. Todisco is a hardworking 33-year-old nurse with no criminal history, not even a traffic ticket. While the nature and circumstances of the January 6th events were indeed serious, her particular actions that day, paired with her individual history and characteristics do not lend itself to a sentence of incarceration. Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive. A probationary sentence would provide adequate deterrence to Ms. Todisco, avoid an unwarranted sentencing disparities among other January 6th defendants and is warranted in light of her nearly stellar performance on pretrial release.

   I.   <u>**Nature and Circumstances of Ms. Todisco's Offense**</u>

The events of January 6th are seared into the nation's memory. That day and the days after resulted in lost lives and over 1 million dollars in property damage. In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Ms. Todisco understands and would never minimize the impact of the event on the nation. However, she was not the cause of January 6th, nor was she in the category of people who caused physical harm to others or damage to the Capitol buildings. She entered the building, but her unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[15] To characterize Ms. Todisco as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual. The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As stated above, Ms. Todisco traveled and attended the rally with her friend. She and her friend walked from the rally into the Capitol building. As she explained to law enforcement a few weeks later, she attended the rally and then walked for about 1 hour to the U.S. Capitol Building. She did not go inside

---

[15]   *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

immediately. She admitted that she went into a room in the Capitol and walked around and came out. The room was Senator Merkley's office, which was not clearly labeled.

Ms. Todisco also stated that officers were present and that officers instructed the group not to break, steal or deface anything. Notably, by the time Ms. Todisco and her companion entered the Capitol, hundreds of people had already entered the building. Video footage from her cell phone, provided to the Court, shows officers not fighting or pushing the large crowd of people out of the building. It is undisputed that after the breach into the Capitol, law enforcement had been overwhelmed by the crowd. However, from Ms. Todisco's perspective, entering the building later than the massive crowd that initially entered, she stated that law enforcement was standing there as people entered. In any event, Ms. Todisco did not break any windows or forcibly enter the Capitol. She has admitted guilt and is remorseful for her conduct.

## II. Ms. Todisco's History and Characteristics

Ms. Todisco comes from a loving family, surrounded by extended family members. Her father spent time in prison which had a serious effect on her. See ECF No. 58, ¶ 45. After he was released, he left the family. She maintained contact with him. She became very close to her maternal grandfather. He died from cancer and it was difficult for her to see him suffer.

Ms. Todisco has been working in the medical field for 8 years. She obtained her nursing certificate in basic life support in 2014. She advanced her certificate

9

into a general nursing certificate in 2020. She obtained her pediatric certificate in 2021. This year, she became trauma certified and obtained her neo natal certificate. Due to her desire to work hard in her field, she moved to Florida to pursue a career at a Level 2 Trauma Hospital for less than what she earned per hour in her previous nursing position in New York. It is well-known that due to the pandemic, the country is in need of medical professionals, like Ms. Todisco. "Nursing shortages have long vexed hospitals. But in the year and a half since its ferocious debut in the United States, the coronavirus pandemic has stretched the nation's nurses as never before, testing their skills and stamina as desperately ill patients with a poorly understood malady flooded emergency rooms."[16] "The situation keeps growing more dire throughout the pandemic, which exacerbated conditions — including widespread staff burnout and an aging workforce — behind a looming nationwide nursing shortage."[17]

Due to her remorse, her background, her lack of criminal history, and her performance on pre-trial supervision, a probationary non-incarceration sentence would be not greater than necessary to address her conduct in this case.

---

[16] Jacobs, Andrew, 'Nursing Is in Crisis': Staff Shortages Put Patients at Risk, New York Times, Aug. 21, 2021, https://www.nytimes.com/2021/08/21/health/covid-nursing-shortage-delta.html
[17] Boyle, Patrick, *Hospitals innovate amid dire nursing shortages,* American Association of Medical Colleges News, Sept. 7, 2021, https://www.aamc.org/news-insights/hospitals-innovate-amid-dire-nursing-shortages; see also Maher, Kris, *Covid-19 Hospitalizations Are Down, but Nurse Shortages Stretch Hospitals*, Wall Street Journal, March 2, 2022, https://www.wsj.com/articles/covid-19-hospitalizations-are-down-but-nurse-shortages-stretch-hospitals-11646217000

### III. A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Incarceration is not required in order for a sentence to reflect the seriousness of the offense. "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Ms. Todisco, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual. Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities. Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 299 inmates have died from COVID-19.[18] With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

---

[18] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed July 5, 2022).

11

### IV. A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Ms. Todisco.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Ms. Todisco has been on pretrial release. For the last seventeen (17) months, Ms. Todisco has complied with supervision requirements. The public will be protected while Ms. Todisco is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial

sanctions."). No incarceration is needed to deter criminal conduct in this case.

### V. Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Ms. Todisco to probation would not contribute to an unwarranted sentencing disparity. Nearly 200 defendants have been sentenced in these cases.[19] At least 80% of the cases have been resolved as misdemeanor offenses. Of the misdemeanors cases, more than half have been sentenced to probation or home detention as a condition of probation. January 6th defendants in other cases who pled to the *exact* same federal charge received probationary sentences. *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12 months' probation); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation).

A split sentence is not permissible and not warranted in this case. The government cites several cases to justify its requested sentence, including *United States v. Little*, 21-cr-315 (RCL), in which the issue of split sentences is on appeal. The government cites cases where a sentence of imprisonment and probation were imposed, including the case of *United States v. Blake Reed*, 21-cr-204-BAH. *Reed* is very different from this case. Mr. Reed discussed joining the Proud Boys. Reed, 21-cr-204, Gov't Sent. Memo, ECF No. 171, p.2. Ms. Todisco did not. Reed posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you." Id. Reed brought and used protective gear to the Capitol. Ms.

---

[19] This estimate is based on the government's chart, filed at ECF No. 30-1.

13

Todisco did not.  Reed encouraged his co-defendant to remove evidence.  Ms. Todisco did not.  Reed took steps to conceal electronic evidence on his phone.  Ms. Todisco did not.  Reed appears to have mocked law enforcement after the execution of the search warrant.  Id. at p. 25.  Ms. Todisco did not.

The government also cites to *United States v. Schornak*, 21-cr-278-BAH, where the defendant received a sentence of 28 days of intermittent confinement and a term of probation.  In that case, Schornak "traveled to the Visitor's Center and stole an American flag."  *Schornak*, 21-cr-278, Gov't Sent. Memo, ECF 62, p. 11.  Ms. Todisco did not steal anything.  Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it."  Id. at 16.  Ms. Todisco did not boast about anything.

The government contends that individuals who entered into sensitive spaces of the Capitol should receive stricter punishment.  See Gov't Sent. Mem. at 19.  However, in the cases on which the government relies, the individuals there did more than enter a private office or sensitive space of the Capitol.  In *United States v. Derek Jancart*, 21-cr-148 (JEB), the defendant entered the Capitol within 5 minutes of the breach.  See Jancart 21-cr-148, Gov't Sent. Mem. ECF No. 25 at 5.  He went to the Speaker's conference room area.  While he did not go inside, he took a picture, and posted it online, stating " 'We're In[.]' "  Id. at 6 (quoting Gov't Sent. Mem. at 6).  As the government stated in that case, Jancart "spread false propaganda [on Facebook] that the attack was 'peaceful[,]' comparing the riot to an 'unscheduled tour.' "  Id. at 8.  Ms. Todisco did not spread false propaganda after Jan. 6th.

14

In *United States v. Erik Rau*, 21-cr-467, the defendant entered the Capitol within 5 minutes of the breach. Rau also went inside of the Speaker's conference room. According to the government, Rau brought a medical kit, Kevlar gloves, and wore tactical pants. *Rau*, 21-cr-467, ECF No. 13, Gov't Sent. Mem. at 8. Rau also deleted text message from his cell phone. Id. at 9. Ms. Todisco did not wear tactical gear and did not come equipped for a fight.

In *United States v. Oliver Sarko*, 21-cr-591, the defendant made incendiary statements while inside the Capitol on video: "Where are the traitors?" "Bring out Pelosi!" "We won't let you steal this country." "We're actually breaking in right now." "Fight for Trump!" "Beijing Biden will never be president, we reject communism." *Sarko*, 21-cr-591, ECF 31, Gov't Sent. Mem. at 11. In that case, the government noted that since Sarko live streamed these incendiary statements on Snapchat, "anyone else who accessed Snapchat, potentially millions of persons, including other January 6, rioters, could have listened to those remarks when they were made" and his "demands to 'bring out' Nancy Pelosi" and "to find the 'traitors' were particularly chilling because they could have been seen as a call to arms to other rioters to take violent action inside the Capitol." Id. at 11. Ms. Todisco made no such remarks.

In *United States v. Brian Stenz*, 21-cr-456, the defendant entered the Capitol and appeared to take a puff of possibly THC from a vaping pen upon entering. *Stenz*, 21-cr-456, ECF No. 32, Gov't Sent. Mem. at 5. It appears that he went to Senator Merkley's office and remained there for 4 minutes. Stenz took a picture of

15

the Senator's office and sent it to a friend. Senator Merkley noted that people appeared to have been "smoking something" in his office. Id. at 7. Ms. Todisco spent seconds in the office and did not disrespect the office. Unlike Todisco, Stenz did not mention going into the Senator's office during his FBI interview. Stenz also had a criminal history.

In *United States v. Nathan Entrekin*, 21-cr-686, the defendant entered the Capitol twice and wore a costume, unlike Ms. Todisco. Entrekin also entered two sensitive spaces of the Capitol – the Parliamentarian door and Senator Merkley's office.

Ms. Todisco's conduct was less egregious than other cases where defendants received probation. For example, in *United States v. Jackson Kostolsky*, 21-cr-197, the defendant "scaled the wall to get to the Upper West Terrace," was tear-gassed, and entered the Capitol through the Parliamentarian doors soon after it was breached. He also deleted videos from his phone. These facts are not present in Ms. Todisco's case.

Of the nine factors that the government deems to be critical in these cases, most of them are mitigating factors in Ms. Todisco's case. First, she entered the building nearly 1 hour after the initial breach at 2:11 p.m. after hundreds of people had already entered the building. Second, Ms. Todisco did not encourage violence. Third, she did not encourage property destruction. Fourth, there is no evidence that she encouraged violence or destruction. Fifth, during or after the riot, she did not destroy evidence. Sixth, Ms. Todisco was inside the building for approximately 28

16

minutes and she did not enter the Senate or House chambers where members of Congress were gathering to certify the election. Seventh, she did not make any notable posts on social media. Eighth, she cooperated with law enforcement. And ninth, she has demonstrated remorse. As stated above, Ms. Todisco regrets going to the Capitol and lending her voice to a falsehood about a fraudulent election.

## Conclusion

Considering the § 3553(a) sentencing factors, a probationary sentence and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

                                                  Respectfully submitted,

                                                  A.J. KRAMER
                                                  FEDERAL PUBLIC DEFENDER

                                                  _____/s/_____
                                                  Ubong E. Akpan
                                                  Assistant Federal Public Defender
                                                  625 Indiana Ave., N.W., Suite 550
                                                  Washington, D.C. 20004
                                                  (202) 208-7500